**376**

"The accused devices * * * can be eliminated from consideration for it affirmatively appeared, without contradiction by the plaintiff, that defendant built that device only experimentally and that it has neither manufactured it for sale nor sold any." Dugan v. Lear Avia, Inc., D.C.1944, 55 F.Supp. 223, 229.

This principle was applied earlier by District Judge Seymour, who said:

"It is true that, if an infringing machine is made or used as an experiment merely, it does not infringe former patents." Bonsack Mach. Co. v. Underwood, C.C.1896, 73 F. 206, 211.

The claims in suit, if valid, are not infringed by defendant's experimental use of the accused 422-19 alloy.

The 6059 alloy was likewise a cobalt-nickel alloy with chromium, molybdenum, carbon, and other metals and non-metals. The composition differs from the 422-19 alloy mainly in having less cobalt and more nickel. The maximum molybdenum content of 6059 alloy is 6.5 per cent, which is less than the 7.0 per cent minimum recited in claim 4 of the '935 patent. The '935 claim was not infringed by the 6059 alloy. The minimum nickel content of 30 per cent in 6059 alloy is the same as the maximum nickel content of 30 per cent recited in claim 5 of the '934 patent. Plaintiff's metallurgical expert testified that 6059 alloy was used experimentally. As pointed out above, experimental use is not an infringing use. It is noted that plaintiff has stated that 6059 alloy does not make full use of the plaintiff's patented invention.

The claims in suit, if valid, are not infringed by defendant's use of the accused 6059 alloy.

Summarizing the foregoing discussion, it is concluded that the two claims in suit are clearly invalid over the prior art, and that if these claims are construed to be valid, then the defendant's procurement and/or use of alloys of the agreed composition of S–816, 422–19, and 6059, does not infringe said claims. The petition should be dismissed.

**Arthur W. LAVIDGE**

v.

**UNITED STATES.**

**No. 38–56.**

United States Court of Claims.

· March 5, 1958.

James A. Gillen, Chicago, Ill., Claude W. Dudley, Joseph M. Jones, James T. Lyon, Bernard G. Ostmann, Robert T. Molloy, Washington, D. C., and Walter

McFarland, Chicago, Ill., on the briefs, for plaintiff.

Harold S. Larsen, Washington, D. C., with whom was Charles K. Rice, Asst. Atty. Gen., James P. Garland and Sheldon J. Gitelman, Washington, D. C., on the brief, for defendant.

WHITAKER, Judge.

This suit is brought by a member of the Traffic Club of Chicago to recover the sum of $15, Federal excise taxes imposed by section 1710 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 1710, as amended, on dues paid by plaintiff on account of his membership in the Traffic Club of Chicago. He insists that no taxes should have been assessed and collected because the Traffic Club of Chicago is not a social, athletic, or sporting club or organization.

Section 1710(a) of the Internal Revenue Code of 1939, as amended, levies a tax of 20 per cent on the dues or membership fees paid by a member to "any social, athletic, or sporting club or organization." The tax is to be paid by the member, although customarily it is paid into the treasury of the club as a collecting agent, and by it paid to the Director of Internal Revenue.

The Act does not define a social, athletic, or sporting club, but section 101.24 of Treasury Regulations 43 (1941 ed.) provides in part:

"The purposes and activities of a club or organization and not its name determine its character for the purpose of the tax. Every club or organization having social, athletic, or sporting features, is presumed to be included within the meaning of the phrase, 'any social, athletic, or sporting club or organization,' until the contrary has been proved, and the burden of proof is upon it. * * * *"

Section 101.25 defines "social clubs." It reads in part:

"Any organization which maintains quarters or arranges periodical dinners or meetings, for the purpose of affording its members an opportunity of congregating for social intercourse, is a 'social * * * club or organization' within the meaning of the Code, *unless its social features are not a material purpose of the organization but are subordinate and merely incidental to the active furtherance of a different and predominant purpose, such as, for example, religion, the arts, or business.* The tax does not attach to dues or fees of a religious organization, chamber of commerce, commercial club, trade organization, or the like, merely because it has incidental social features, but if the social features *are a material purpose of the organization* it is a 'social * * * club or organization' within the meaning of the Code. * * * *"
[Italics supplied.]

Many cases in this court and in other courts have sustained and followed these regulations in determining whether or not a particular club is a social club.

The question presented in all of the cases is whether or not the social features are a material purpose of the club, or whether or not they are indulged in for "the active furtherance of a different and predominant purpose, such as, for example, religion, the arts, or business." Each case, of course, stands on its own facts.

The question of whether or not this particular club was a social club was before the District Court for the Northern District of Illinois in the case of Fleming v. Reinecke, D.C., 43 F.2d 257. It was held to be a social club because it was said that the facts were "convincing to the effect that a material part of the club's purpose was, as stated in its articles of incorporation, 'to cultivate friendly and social relations and to promote better personal acquaintance among its members.' The amendment to the articles of incorporation made after the assessment of certain of the taxes is not sufficient to overcome the effect of the facts bearing upon the issue."

The Commissioner of our court in his report does not quote any provision from the club's constitution similar to that quoted in Fleming v. Reinecke, supra. The only article quoted from the constitution is as follows:

"The objects of this Club shall be, through its educational program, to raise the standards of individuals engaged in industrial and/or carrier traffic work, and to promote a better understanding by the public of transportation problems; further, by bringing carriers and industrial traffic men together, to advance their mutual interests."

Apparently the club did not incorporate in its constitution the provision from the articles of incorporation quoted in Fleming v. Reinecke, supra, or if it had been once incorporated in it, it was dropped. But we do not regard this of particular signifiance. The actual activities of the club are more important than the purposes stated in its articles of incorporation or constitution.

Resident membership in the club is restricted to "Supervisory representatives of institutions regularly engaged in or identified with transportation or communication service, also elected Officers and Directors of The Chicago Transportation Club, whose places of business or offices are within thirty miles distant from the City Hall of Chicago."

However, notwithstanding the stated object of the club, we are of opinion that the social features of the club were nevertheless one of its material purposes, and that these activities were not engaged in in order to further the predominant purpose stated in the constitution of the club.

The club rooms are on the fifth floor of the Palmer House, a hotel in the city of Chicago. The club rooms are entered through an entrance lobby. A long hallway runs the length of the club quarters. At the end of it is the dining room, with a capacity of 160. There are two private dining rooms, a large lounge room, a library, a cocktail lounge, and a room for the playing of cards. There are toilet facilities and two shower baths, but no sleeping quarters. The lounge and library are furnished, as such rooms are furnished in the ordinary club containing settees, chairs, and desks. In one of the rooms there is a piano, and there are several television sets.

In addition, there is also a women's lounge. A card is issued to the wife of each member or to some other female member of his household. This card permits her to use the facilities of the club and to invite guests. Women are permitted in the cocktail lounge from 2:30 p. m. on.

The club does not itself serve food and drinks. Instead, it employs the Palmer House to do so. The cost of food and drinks ordered by each member are charged to that member on the books of the Palmer House, but the club is responsible for the payment of these bills in case the member does not pay them himself. The club paid the Palmer House a fee of $2,520 for the service of furnishing food and drinks to the members for the period March 1, 1952 to February 28, 1953. The club itself derives no revenue from the furnishing of either food or drinks. However, it does make these available to the members in the way stated.

A considerable quantity of beverages was consumed by the members both at lunch and dinner in the two years in question, 1952 and 1953. In 1952 there were $48,615.50 worth of beverages consumed, and in 1953 there were $47,815.50 worth of beverages consumed.

The club rooms are extensively used for the playing of cards. The club keeps on hand decks of cards for purchase by its members.

The club has a reception committee, which keeps men on duty at the front door during lunch hour to act as hosts. A welfare committee keeps informed of illnesses and deaths among the members and takes appropriate action. There is a bowling committee, which supervises a bowling league, which is composed of over 100 members of the club, who gather

once a week for matches among themselves. The club also has a home-and-home series with the Milwaukee Traffic Club. These matches are followed by a party and dinner. The wives of the members participate in the party, and travel with their husbands to Milwaukee when games between the Milwaukee Club and the Chicago Club are being played in Milwaukee.

Eight parties were arranged by the entertainment committee between March 12, 1952 and February 5, 1953. These parties were attended by the wives of the members.

The club has golf outings, and baseball outings. Most of these sporting events are paid for by the members participating in them, but the club does advance to the various committees funds for their use, which advances are ordinarily repaid to the club, most of the entertainment committees being self-sustaining.

During the year 1952 the club itself sponsored 17 separate social functions, including parties, dinners, golf outings, baseball outings and parties, bowling matches, and other parties. This is in addition to such parties as were held in the club by the individual members on their own initiative.

It cannot be denied that according to the constitution of the club its predominant purpose is the promotion of better understanding between individuals engaged in traffic work and in the education of such persons and others with relation to traffic problems. However, we do not think it can be denied either that, although this is the predominant purpose, social activities are a material purpose of the club, and are not merely incidental to, and for the promotion of the stated purpose of the club to promote better traffic work and understanding.

Of course all the activities engaged in by the wives of the members of the club have no relation to its stated purpose of promoting better traffic conditions, but are altogether social in nature. The consumption of beverages by the members of the club is essentially social. The bowling activities of the club are considerable, and they, of course, are of a social or sporting nature; likewise the golf outings and the baseball outings.

We must conclude that its social features are a material purpose of the club, and that it must be held to have been a social club, as it was heretofore held to be by the District Court for the Northern District of Illinois. The facts before the court in that case are somewhat different from the facts before the court in this case, but they have a great deal of similarity.

We think this decision is in line with former decisions of this court in Arkwright Club of City of New York v. United States, 117 F.Supp. 411, 127 Ct. Cl. 247; Railroad-Machinery Club v. United States, 95 F.Supp. 822, 118 Ct.Cl. 542, 560; Bankers Club of America v. United States, 87 F.Supp. 253, 115 Ct.Cl. 50; Drug & Chemical Club of New York v. United States, 115 Ct.Cl. 66; Engineers Club of Philadelphia v. United States, 42 F.Supp. 182, 95 Ct.Cl. 42; Transportation Club of San Francisco v. United States, 17 F.Supp. 201, 84 Ct.Cl. 253.

Plaintiff's petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and MADDEN and LITTLETON, Judges, concur.

LARAMORE, Judge, took no part in the consideration and decision of this case.